Good morning, Your Honors. May it please the Court, I'm John Holmes on behalf of Liberty Mutual, and if I may, I'd like to reserve half of my allotted time for rebuttal as well as response to counsel's argument on the cross-appeal. I'd like to begin my argument by discussing the Court's judicial estoppel rule against Liberty Mutual on its complaint against Snow Valley. None of the predicates for a judicial estoppel ruling were present. There was no knowing misrepresentation to any other court. For example, the uncontradicted, unobjected-to testimony of Douglas Watkins is that he told the Workers' Compensation Court that Liberty Mutual was paying money to the settlement. The district court had found that Liberty Mutual had represented to both the Superior Court and the Workers' Compensation Court that it was not contributing anything to the settlement, and on that basis has stopped it from asserting in this case that it had contributed to the settlement. In the Workers' Compensation Court, Mr. Watkins informed the Court that Liberty Mutual was contributing, provided the Court a copy of the settlement agreement, and explained its meaning to him. Nothing Liberty Mutual did in the Workers' Compensation Court could be construed as a representation that it was not paying money in the settlement. In the Superior Court- It looked pretty fast and loose to me. I'm sorry, Your Honor? It looked pretty fast and loose to me. The procedure was a little unorthodox, and that's a result of the context in which the litigation was happening. You had a circumstance where Liberty Mutual's insured was basically cooperating against it. They were, you know, giving depositions in the civil case. The Workers' Compensation Court had been, or a case had been stayed. And so what happened was the attorneys appearing on behalf of Snow Valley in the civil case were asserting positions that were directly adverse to Liberty Mutual's and Snow Valley's interests in the Workers' Compensation case. And because the Workers' Compensation case was not proceeding, Liberty Mutual hired a civil attorney to file a deck relief action, get it joined to the proceeding in the civil court, and contest the course and scope issue in that case. And so because we were forced into this odd litigation posture, you know, the settlement structure was a little odd, frankly. Yeah, one of the things that puzzled me about the settlement, not just structure in the end, but also the settlement negotiations, is how the number climbs from $150,000 as the estimated value of the Workers' Comp claim. It's sort of like one of these asymptotic curves. As you get closer and closer to that settlement, all of a sudden that number jumps to $750,000 from a fairly low number. How did that happen? Well, I'll tell you. Actually, the estimate was never $150,000. Back on October 31st of 1997, the Workers' Compensation attorney sent Snow Valley a letter analyzing the case and estimating the probability of a course and scope finding at 25% and the exposure at $3 to $3.5 million. And so she told Snow Valley then that there was a, you know, non-insignificant chance that there would be a substantial award. So the $750,000 was sort of an approximation of the 20 to 25% chance of course and scope times the magnitude at the outset. And so what happened was… I assume the other side may have something to say about what you just said. Perhaps. But what happened? And so then following in 1998, in early 1998, they had cut this deal for $150,000, which looked like a great settlement at the time in view of the uncertainty concerning the course and scope issue and the magnitude of Mr. Buenel's injuries. Mr. Buenel then got rid of the lawyer who had agreed to that settlement and hired Mr. Wheeler, who came in and immediately scrapped that and set about litigating in the civil court and encouraging Mr. Buenel's Workers' Compensation attorneys to stall and stay the Workers' Compensation case so that Liberty Mutual could never get a determination in that Workers' Compensation case on the course and scope issue. At the same time, Hancock, having reported to Snow Valley, asked it to check its Workers' Compensation policies and to let it know if there was some problem, told Snow Valley that they were going to start putting pressure on Liberty Mutual to contribute. And to do that, they erased the exclusive Workers' Comp remedy defense, asserted that Mr. Buenel had been in the course and scope of his employment at the time of his injury, and ultimately moved to trifurcate the case to try the course and scope issue first, and in its correspondence to Snow Valley said they were doing that to pressure Liberty Mutual to contribute. Liberty Mutual was in the best position to figure out what was going on. It's the only one who knew the terms of both of its policies. Liberty Mutual didn't know whether there was a substantial SIR under the $7 million CGL policy or any of the other terms of that policy. Snow Valley had all the information at its disposal. It should have known, because of the correspondence from its counsel, what Hancock was doing in the case. And so, frankly, Liberty Mutual was faced with a situation where it couldn't move the Workers' Comp case forward and it was faced with a non-cooperative insured, or so it appeared in the civil case, and it got involved in the civil case to defend the position on course and scope in that case, and therefore the settlement went down in kind of an unorthodox way. Who signed off? How high up in the company did it go to sign off on the $750,000 settlement by Liberty Mutual? I don't know, but the undisputed facts are that the people who negotiated the settlement and made the recommendation were unaware of the retrospective premium feature in Snow Valley's policy. Is a retrospective premium a common feature of Workers' Comp policies? It's not. They're all different sort of – well, it's not uncommon, but it's not common either. Are you telling me that the lawyers representing Liberty Mutual had no idea that this policy had such a feature, or are you telling me they just didn't know what the number would result in? They didn't know it had that feature. They said they'd never read the policy? No. That they were defending under? No. There's a case in Snow Valley's brief called East Port or Port East Transfer. It's out of Missouri, and it's against Liberty Mutual, and it discusses the fact – it's a 1993 case – discusses the fact that Liberty Mutual back then would have its claims handlers and Workers' Compensation attorneys aware of the retrospective premium feature, and it got sued for that because the fear was that the claims handlers and the attorneys would be too free with the insurance money since it's not their employer's money. And so having had those difficulties, Liberty Mutual then stopped letting its claims handling people, the people on the front lines, know that there was a retrospective premium feature. Including lawyers representing them? I can understand how they might not do that with adjusters, but the attorneys representing them are forbidden to read the policy? Yes, because Workers' Compensation policies are creatures of statute. The policy provides coverage that is coextensive with the employer's liability under the Workers' Compensation law. It doesn't say we'll pay for this, this, and this. It says we'll pay for what you have to pay under the law. And so there's never really an issue as to the extent of coverage, and the financial aspects of the policy really aren't the concern of the person defending the Workers' Compensation policy. Mr. Holmes, are you saying, then, that the fact that the attorneys arrived at $750,000, which is precisely the figure on the retrospective plan, that that is purely coincidence that we arrived at exactly that same figure? Yes, Your Honor. It's purely coincidence. A dollar more and Liberty Mutual would have picked up anything over $750,000. Is that right? Or that still would have been? Somewhere around there. You know, $750,000 is close to the maximum. I don't know the precise dollar figure before it becomes Liberty Mutual's money again. But it wouldn't be more than $10,000. Mr. Holmes, let me tell you what's bothering me about the waiver problem. It appears to me that Liberty Mutual goes in to the California courts and tells the court that this is not a Workers' Comp claim. And they stipulate with Mr. Bunnell that this did not occur in the course and scope of his employment. Now, the benefit to Liberty Mutual of doing that is that it does not have to have the settlement approved by the Workers' Comp Board. Am I correct on that? The stipulation was made in the Superior Court. In San Bernardino. And it was designed to cut off any further claims because It does two things. One, it relieves them of the burden of having the settlement approved by the Workers' Comp Board, which has jurisdiction to approve any Workers' Comp settlement. So by stipulating that it did not occur in the course and scope of his employment, of Bunnell's employment, then Liberty Mutual is relieved of any burden of having the settlement approved by the Workers' Comp Board. Secondly, you've got the problem that it also relieves Liberty Mutual of having to respond to any liens that might be against Mr. Bunnell, medical liens. Respectfully, Your Honor, both of those are overstatements. In fact, what happened was the Workers' Compensation Committee proceeding didn't just go away because of a stipulation and finding made in the Superior Court. Mr. Watkins took the settlement agreement down to the Workers' Comp judge, gave him a copy, gave her a copy, excuse me, explained its terms to her, told her that Liberty Mutual was paying money, and then they got the case dismissed. Now, the petition for dismissal was by Mr. Bunnell, and it recites that it's fair and that his attorneys looked into it and all of that. So it's kind of a form over substance objection that they didn't do a compromise and release procedure. Are you suggesting then that the Workers' Comp Board just sort of winked at all of this and just said, well, we sort of know what's going on, but why wouldn't the Workers' Comp Board simply do this straight up and say, look, these are very, very generous terms. Not often did you get $3.5 million in settlement on a Workers' Comp claim. This is more than generous. Of course we'll have no problem approving it. Frankly, Your Honor, I don't know exactly why they came up with this structure. When they go in to talk with the Workers' Comp judge, does he disclose that Liberty Mutual is the Workers' Comp insurer and that Liberty Mutual is going to be contributing to this plan? Those are two different things. Yes. Liberty Mutual is a party to the Workers' Comp procedure. In fact, it is very common in Workers' Comp cases for the employer to just drop out of the case and it's really the claimant or the worker against the Workers' Comp carrier because the coverage under the policy is completely coextensive with the employer's liability so that the employer could never be liable under the law for anything that wouldn't be covered by the policy so that really the insurer is the real party in interest in those proceedings and oftentimes the employer is just not involved. Also, Snow Valley's general liability carrier didn't appear in the Workers' Compensation proceedings so the only people there in front of the judge were Liberty Mutual, as the Workers' Comp party to the case, Workers' Comp carrier party to the case, and Bunnell and his attorneys. Okay. How about addressing the second question about the lien holders and why this doesn't free Liberty Mutual from any subsequent claims? It's kind of a semantic game that I think Snow Valley is playing with that. I mean, to be a lien holder you have to have filed a lien. The settlement agreement provided for the satisfaction of all liens that had been filed as of that time. Until you file the lien with the Workers' Comp court and serve it on the parties to the Workers' Comp proceeding, you have no lien. Could Liberty Mutual have been liable for any subsequent filed liens? No, because the case would be over. And that's typical in a situation where a Workers' Comp proceeding comes to an end, even by a compromise and release. But it wasn't a Workers' Comp claim. So anybody who filed subsequently would be out of luck anyway, right? I'm sorry. I don't understand that question, Your Honor. Well, since the Workers' Comp board agrees that this is not a Workers' Comp claim, anybody filing a subsequent lien would not be able to file against Liberty Mutual. Your Honor, the Workers' Comp board didn't agree that there wasn't a Workers' Comp claim. I mean, the whole reason the proceeding existed was Mr. But they didn't approve the settlement in accordance with California law. But all that does is mean that the release that was obtained was invalid. And it's invalid until approval is obtained. In theory, at least, Liberty Mutual and Mr. Buenel could go back there today and get an approval of it. It doesn't mean that there's a finding that there was no Workers' Comp claim. It's silent on that issue. Okay. So what happens if there is, subsequent to the settlement, if there is a lien filed? That would be Mr. Buenel's responsibility because there would be no claim anymore. And that's what always happens when a Workers' Compensation claim comes to an end. His future medical care and things like that come out of his pocket. In fact, there are different forms of compromises and release. Under the Workers' Compensation system, there are a variety of streams of benefits that flow. There's disability. There's current medical. There's rehabilitation and training. There's future medical. And each one of those streams can be the subject of a different compromise and release. And sometimes they leave future medical open, in which case the liens can continue to be filed. And sometimes the whole thing is just cut off by a compromise and release, and no more liens can happen. And it becomes the responsibility of the claimant, who has now been paid in a lump sum, rather than getting a stream of benefits over time, to satisfy his bills. So, yes, the dismissal cut off lien claimants, future lien claimants, if any there were. There weren't any known at the time. No other liens had been filed. The settlement provided for satisfaction of all liens that had been filed. And it's kind of a non-sequitur to talk about lien holders who haven't filed liens. I mean, the lien holders were paid. The district court, as a matter of summary judgment, held that there was no entitlement to punitive damages here. Why is there no trialable issue of fact on punitive damages? California law, of course, allows for punitive damages against insurers. I'll say it in sort of summary form. If the offender of fact is convinced that there's some form of bad faith, why is that factually unavailable to a jury to decide? I'm not saying that there is or is not. I'm saying why is it so clear that no jury could decide? Well, first of all, the standard for punitive damages under California law is much higher than for bad faith. For bad faith, you need unreasonable conduct. For punitive damages, you need malice and oppression and basically discipline. I know the California standard. You premised your question on the notion that once you found bad faith, why couldn't there be punitive damages? The reality is, under the contract, Liberty Mutual had the right to settle claims. And Snow Valley's position is essentially, gee, if there's any uncertainty about whether the employee was in the course and scope, you've got to make that guy litigate the judgment rather than pay him. That's contrary to the goals of the workers' comp system, which is to get benefits into the hands of claimants, injured workers. In this situation ---- But here are the facts that a jury could say. They could say that number of $750,000 is to us a very suspicious number. The settlement amount that seemed reasonable at an earlier time climbs up enormously. There was an objection fairly late on, but there was an objection shortly after Snow Valley learns of it, but they blow it off. I mean, there comes a point at which I think a district judge would be unable to reverse a jury verdict that would find punitive damages. Well, let me tell you why the number keeps going up. The number keeps going up ---- No, you told me already. But the jury's entitled to disbelieve that. Well, there was an early evaluation, which put the number right in that ballpark. Then there was an early settlement, which the claimant rejected. So, obviously, $150,000 isn't going to do it for this claimant. And, frankly, I can understand that in his circumstance. And then the Hancock firm starts putting the pressure on for more and more money, and they keep raising the money. And you look at the correspondence, and they're asking for a half-million-dollar contribution from Liberty Mutual. And ultimately, they're telling Snow Valley, we think we can get $750,000 from them, or 25% of $3 million. And so it goes up that way. And, frankly, that's the way settlements work. Mr. Bunnell's attorney, after he hired Tim Wheeler, had been asking for $8 million. And so there was the usual settlement negotiation where the numbers kind of converge. And it really, you know, the fact that the people involved in decision-making about this settlement didn't know there was a retrospective premium feature is undisputed. There's no contrary evidence, and Snow Valley didn't dispute it. So it may look suspicious, but it's perfectly innocent. You know, that's the way it is. And in terms of the odd procedure used to settle the thing, under the labor code, if you don't do a compromise and release, the release is invalid. Who does that hurt now? It only hurts Liberty Mutual because we're at the end of the retrospective premium feature. It's maxed out. If Mr. Bunnell comes back now, that's Liberty Mutual's money. And so, you know, it's kind of a form over substance objection to the procedure used. And it's a result of the odd fact that Snow Valley's counsel in the civil proceeding were going to litigate to a position that would basically prejudice both Snow Valley and Liberty Mutual in the workers' comp proceeding. And so Liberty Mutual was effectively dragged into that civil proceeding using a civil lawyer, understandably, not completely familiar with workers' comp, as many people aren't, who then negotiated the settlement in the context of the civil case that, you know, resulted in this sort of irregular procedure used to terminate the cases. The bottom line is that there was no representation to either court that Liberty Mutual wasn't going to pay any money to the settlement. In the workers' comp court, Mr. Watkins, unobjected to undisputed testimony, is that he explicitly told the judge Liberty Mutual was paying. And he gave her a copy of the settlement agreement. And he explained how the settlement functioned to her. In the superior court, the situation's more or less the same. There was no explicit representation, but you have to consider the context. In that civil court case, course and scope was the big issue. Hancock had raised it as an affirmative defense in the answer. They'd moved to trifurcate it. Liberty Mutual had taken the unusual step, which had to have been noticed by the judge, of intervening in that case to contest the course and scope issue. So when the parties arrive in front of that judge and say, hey, we have a global settlement of all claims. And as part of that settlement, you have to enter this finding. And the settlement agreement recites that it's consideration for the settlement, the stipulation. But they tell the judge, we want you to stipulate to this finding, which goes completely Liberty Mutual's way. He could only assume that Liberty Mutual was paying for that stipulation. Otherwise, why would it happen in the context of a settlement where, you know, stipulated facts frankly aren't going to matter anymore because the case is over? So, you know, obviously Hancock wasn't paying for that stipulation. It had to be Liberty Mutual paying for that stipulation. Well, maybe the judge had a lot of other things going at that time. And the attorneys come in and say, well, you know, how much was the total bundle? It was $2.9 million. $2.9 million. And he was thinking, well, okay, you know, because this young man's a quadriplegic. And so this is the way these guys concoct all of this. And all I'm really thinking about is this kid going to get enough money to care for him for the rest of his life? And so he signs it. I mean, he's not making assumptions that this and that and all this, you know. That may well be, Your Honor. He's got hundreds of cases on his calendar. That is undoubtedly true, Your Honor. But fundamentally there was no representation. Nobody told him. Did any of the lawyers tell him about the $7.50 and where that was going to go and how all this was going to work out? No one told the Superior Court judge who was paying what or how much. But the important fact is no one made a representation of any kind to this judge that Liberty Mutual was not paying. And this Court entered no ruling that was premised on the notion that Liberty Mutual was not paying. And that's required for judicial estoppel. And so — Well, you know, judicial estoppel, that's a discretionary matter anyway. I mean — Well, that's correct, Your Honor. But I think the proper way to view that is that once the prerequisites for judicial estoppel are present, the judge then exercises his discretion as to whether or not to impose judicial estoppel. But in the complete absence of the prerequisites for imposition of judicial estoppel, then it's not even a matter of discretion. First he has to find these inconsistent statements. And there just simply weren't any here. There was no representation to either judge that Liberty Mutual was not paying. And, in fact, there was a contrary representation to the workers' comp judge that Liberty Mutual was paying. And so — I mean, did anyone tell the judge, well, this is the total amount, and this is — they're paying this, and we're paying this? They didn't break it down, did they? No, they did not, Your Honor. Yeah. So how is he supposed to know all this? Well, it's a global settlement, first of all. And, you know, the context, as I explained earlier, indicates that — I don't think that judicial estoppel thing is going to work for you. That's my view. But anything else we got here? Well, I do want to, you know, touch on a couple other points relating to judicial estoppel. Let's look at unfair advantage. What is the unfair advantage here? Supposing, as the district court found, Liberty Mutual had told the superior court judge or the workers' comp judge or both, hey, we're not paying anything for this settlement. How would Snow Valley be in any different position than it is now? It wouldn't. You know, the fact that those judges might have thought Liberty Mutual wasn't paying anything didn't prejudice Snow Valley in any way, shape, or form. And so that's another reason why you can't impose judicial estoppel here. And finally, there are no rulings by either court that are premised on the notion — Does the employer know that they'd be billed for the $750,000? Yes. The evidence is that Phil Jones, the general manager of Snow Valley, understood the retrospective premium feature. And he knew — And he was the one that the Hancock firm corresponded with beginning — Ultimately, you know, the insured would have to come up with that. No one discussed with them the specific financial ramifications of this settlement, but they'd been operating under this arrangement for some time. They'd been paying retrospective premiums. They knew that claim payments to injured workers of theirs resulted in retrospective premiums to them. And in fact, in February of 99 — I'm sorry, in June of 99, Hancock wrote to Snow Valley and warned them that by asserting the exclusive workers' compensation remedy in the civil court case, they could shove the whole thing into the workers' comp court case. And that could, quote, could be very costly, close quote, potentially to Snow Valley. And they suggested that Snow Valley check their policy and determine the financial features of that policy to see if there was a big deductible, whether there was an SIR or a retrospective premium feature. And so — and then, again — And you guys never go back to Snow Valley and say, we're planning on paying the amount of the retrospective premium. Any objections to that? You never say that to them. Well, our obligation under the law is to pay the claimant. We have a duty to make reasonable settlements, which is what we did here. And frankly, it wouldn't be proper to allow Snow Valley, as the employer, to say, oh, no, no, don't do that. That's not the goal of the workers' compensation system, which is to put compensation — A reasonable settlement here is $750,000. In light of what was understood to be the potential for a finding adverse to Liberty Mutual and Snow Valley on the course and scope issue and the magnitude of the injuries to Mr. Bunnell, it was reasonable. It was a bargain. Frankly, yes. All right. Okay. I see I've gone well beyond my allotted time for the first half of the argument, if there are no other questions. Okay. Okay. Thank you. So you get all those papers together, and I think maybe you're going to give us a snow job. May it please the Court. I'm going to first address the appeal, and then I'm going to address the cross appeal with the time I have left. I'd like to begin by quoting the testimony of Mr. Watkins, the attorney who proposed the dismissal of the workers' compensation case. He stated the reason why he did that and not a compromise and release was, quote, because there's still the liens that are out there. You still have to resolve those. And typically with a compromise and release, if you can settle them before the settlement, then you do. But if you don't, then you have to settle the case with applicant, and you still have to negotiate or do whatever with the lien claims. So on a settlement and release, you typically reserve jurisdiction for the board and say that defendants will adjust the outstanding liens and litigate them for whatever. So I would have thought I would have had that out there. I considered both of those, and my thought was the best way to get rid of not only the case, but also get rid of the liens so we wouldn't have to pay any additional money is to get a dismissal with an acknowledgment by the injured person that he was not in the course and scope of employment. Then if any lien claimants came back later, I could say he dropped his claim and he admitted he didn't have a work injury. That was the strongest way to deal with the lien claimants, which addresses directly Liberty Mutual's argument that it was up to the worker to take care of subsequently stated liens. In addition, in explaining the effect of his strategy on the court, he explained the following. Quote, in a compromise and release, generally you are settling a case. You are providing some sort of dollar amount, and in exchange you are dropping all claims. An agreement to dismiss a claim you are paying for or you are not paying for, or at least it would appear to the workers' compensation board you are not paying for that. So it's just the dismissal, not a settlement. And finally, there are two documents in Liberty Mutual's closing files that indicate that no money was paid to settle a workers' compensation case or a non-negligible claim that might exist. The first form under the heading settled, other, it wrote zero, order of dismissal. On the second form, it checked the box for dismissal, not settlement. And under the total amount of settlement, it wrote zero in comp case. When this attorney was asked why he indicated that zero was paid in the settlement of the workers' compensation action, he testified as follows. Quote, I don't know. It might have been an error. I think I just meant we didn't pay anything and filed in the workers' comp case. I just put zero for the comp case. I really don't think I gave it much thought because I didn't give anything in the comp case that I was representing. But I just put that down. He then went on to state that, quote, this was not done as a settlement in the workers' compensation case. Now, Liberty Mutual contends that Mr. Watkins went to the judge, gave her a copy of the settlement agreement, explained to her the terms, and then told her that Liberty Mutual was in fact contributing. That couldn't be farther from the truth. The truth is that attached to the dismissal order was a copy of the settlement agreement. It just so happens that the settlement agreement didn't state the amount that Liberty Mutual was paying. It didn't state the amount that either company was paying. Moreover, what was very clear in the attachment was that there was an explicit finding that there was a stipulation that the employee was not in the course and scope. And if the judge was going to assume anything, it wouldn't be that Liberty Mutual was making a payment, but that there was a release for Liberty Mutual because he was not in the course and scope and that the general liability. Why would Liberty Mutual be there unless Liberty Mutual was making a payment? Your Honor, because they were the – it was – this was before the workers' compensation judge. And before the workers' compensation judge was the claimants, Bunnell, and Liberty Mutual for Snow Valley. They're – the – Watkins was a representative of both Snow Valley and Liberty Mutual. That was the attorney who created this scheme whereby they would – whereby they wouldn't do a – And so you're suggesting that Watkins was representing that Snow Valley was paying for the workers' comp claim, but not Liberty Mutual? No, Your Honor, I represent that Watkins represented to the court when he sought a dismissal and when he put zero paid in the workers' compensation case in his files that no money was paid to settle the workers' compensation claim. It wasn't until the postmortem changing of testimony attempted by Liberty Mutual whereby the original answer that Watkins gave at his deposition was, I don't remember whether or not I talked to the judge at all about the settlement agreement. Then, just so happens, after that testimony comes out, Liberty Mutual counsel sends a correction of the testimony which now states, well, I think I remember discussing these things with the judge. And then Liberty Mutual comes before this court and states that not only did it discuss it, but it explained to the judge that it was making payments and all of these things that couldn't be further from the truth. That just didn't happen. Moreover, Liberty Mutual hasn't presented a record with what was stated. And as the district court understood, a dismissal is inconsistent with payment because as Judge Bivey recognized, that under the law, the court has to approve a payment. So regardless of whether there was an attachment, and even assuming that the judge understood that they were making some payment, it's irrelevant. That means the court would have to assume that the judge was acting contrary to law that's easily understandable in addition, it fails to explain Liberty Mutual's actions in attempting to send the check to the other insurer so that they could make the payments to the worker. There's just a whole plethora of problems with their argument. Moreover, they fail to address two critical issues. First, in the dismissal order, it stated that the copy of the agreement was to be filed with the superior court. That didn't occur. At the superior court, Mr. Wexler, who only represented Liberty Mutual, he ---- Let me ask you this. Yes, Your Honor. Did Liberty Mutual actually pay out three-quarters of a million dollars? I believe that they at some point did pay it out. Whether or not they paid out the money on the day they said when they said they did or whether or not they paid the money over monthly payments is a different question. Who did they pay it to? It is unclear. The evidence that they submitted suggests that the money was paid. It doesn't specify to whom. They suggest in their brief that the money was paid in April. And then the agreement for the settlement was signed in the ---- Didn't that money reach your client at $750,000? Do you mean reach the ---- I'm sorry. Did it reach the injured party? I assume that it did, but we do not have any evidence. What I understand is the settlement agreement contemplates monthly payments through an annuity. However, Liberty Mutual claims that it made a $750,000 lump sum payment over ---- And why would that be of concern to you? Because I think it goes to the credibility of Liberty Mutual as to what occurred here, what they said to the ---- Why does it matter whether Liberty Mutual is paying $750,000 in one lump sum or whether it's paying it over the course of a year? Your Honor, it only matters to the extent of the credibility of the statements as to what occurred. But it doesn't have anything to do with whether or not you've got a retrospective payment to make to Liberty, which is the legal issue here, right? Well, it does to the extent that our argument is that under the policy, we only were obliged to pay a retrospective premium for amounts due under the workers' compensation law. Our argument is to the extent they made ---- And your argument is that none of this was workers' comp because that's what Liberty Mutual represented to the workers' compensation board, and therefore you don't owe workers' comp. Absolutely. And they had that zero in there, too. Absolutely. So what else do you want to tell us? Thank you. I would like to address a few more points on the appeal, and then I'll address the cross-appeal. First, your Honor, is that there were also other defenses that we raised. At page 20 of our initial brief, we noted that there we ---- not only did we raise judicial estoppel, but we raised contractual estoppel, collateral estoppel, and illegality of contract. Quickly, under contractual estoppel, the fact that the contract stated that there were ---- that Bonnell was not in the course and scope and it was foreverly determined, that prevented them from coming into this Court and then saying that the payments were made under the workers' compensation law. I ---- no doubt Liberty Mutual will get up and argue that Civil Code section 622 states that it doesn't apply to a statement of consideration. But if the Court looks at the annotations to that section, those cases say that exception, where it doesn't apply to consideration, only refers to a person saying that they can dispute that the consideration was ever paid, but not a factual matter whether or not a person was in the course and scope of the employment. Now, on the issue of the elements of judicial estoppel, counsel represents that there are prerequisites. That's simply not the case. If the Court would refer to New Hampshire v. Maine, the United States Supreme Court case in which in 2001, the first case in which they addressed it, the Court stated as follows, which is cited in our brief at page 28. Courts have observed that the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle. Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case. The Court goes on to explain that the three factors typically used are inconsistency of position, that there's either an advantage gained or a detriment created, and then the third was that — I'm sorry. The second one was that it's accepted by the Court, and the third is that there's an advantage gained or an unfair detriment imposed. However, the Court concludes, in enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. And as Judge Pregerson pointed out earlier, it's a discretionary matter. Liberty Mutual fails to address the standard of review. Yes, it's on summary judgment, so therefore the Court evaluates de novo whether there's a triable issue, but they entirely fail to address that the standard of review for application of judicial estoppel is abuse of discretion. So even if this Court was to disagree with the application, if it was the court of first instance, the real question is whether or not it was within the discretion of the trial court to so find. Now, on the — You have all this in your brief, right? Yes, Your Honor. Well, you don't have to repeat it. Okay. Now, Your Honor, Liberty Mutual stated that none of its employees or attorneys knew about the retrospective premium adjustment. That assertion is false. As is demonstrated by Paula Hayton's Bocomp notes, my understanding is that the workers' compensation attorneys have a system where they make notes in it. At one point, she notes that her understanding is that the — is that she needed to seek authority from counsel for Snow Valley to have approval of the settlement because that was part of the pattern and practice, and necessarily she must have understood the adjustment feature. If there was no adjustment feature, why would she need to seek the authority of Snow Valley for a payment of $150,000? It would be whatever the deductible would be. Only if she knew that it was Snow Valley's money that she was spending would she need to check into that. I'd now like to address issues on the cross-appeal. I think the only one you really need to talk about is punitive damages. Thank you, Your Honor. In this case, there's no doubt that a jury could reasonably determine that Liberty Mutual's actions rise to the level of oppression, fraud, and malice. First, on the issue of fraud, as explained earlier, two different representations were made to the courts. First, Liberty Mutual represented to the workers' compensation court that it would file the copy of the agreement with the superior court. Then, in the superior court, it didn't file the copy of the agreement and stated it was confidential. Moreover, in front of the superior court, when the judge asked if all parties had signed the settlement agreement, the plaintiff's attorney said, yes, all parties have signed. And Mr. Wexler, who represented only Liberty Mutual, and the other attorney that was present, neither one corrected the judge. That goes to the issue of fraud. In addition, our argument is that Liberty Mutual recognized that there was an issue in the civil arena. As Liberty Mutual's counsel pointed out, there was odd facts. By arguing exclusive remedy, Liberty Mutual was required to send in representation into the civil arena. However, they didn't send in a representative of both Liberty Mutual and the insured. They sent in a representative that only represented their interests. In other words, it was oppressive. Moreover, when they did receive an objection, even if it was late in the game, and we don't dispute the reason why it was late in the game, because, quite frankly, the people at Snow Valley that recognized what was going on didn't find out about it. Yes, there's an issue of whether or not they're responsible for documents that they receive, and we don't dispute that. But Mr. Jones, contrary to Liberty Mutual's contention, he didn't understand how the retrospective premium worked. And he didn't receive these memorandums telling him, you're going to have to spend $750,000. It said, check in to what your policy said. His understanding was that under the policy, Liberty Mutual had to consult with the insured. It was his understanding that they wouldn't settle anything absent authority. So this notion that he knew exactly what was happening is absolutely false. Moreover, when Liberty Mutual did receive the objection to the settlement, what did they do? They did nothing other than attempt to hide the ball from Snow Valley. Liberty Mutual on May 5th receives the notice objecting to the settlement. On June 1, the hearing at the Workers' Compensation Court of Appeals and the hearing in Superior Court is held. They didn't provide notice to Snow Valley for either hearing, despite the fact that they objected. Then they charge them, once they do agree to $750,000, they charge them 126 cents for every dollar that they settled the case as their administrative fee. And then when they file this action, they claim that in the complaint, as stated in our brief, that it was filed under the contract. And now this argument has sort of changed into, well, it wasn't under the contract. It wasn't a settlement of the case. It was a settlement of a non-negligible claim. This is the type of conduct that's reprehensible. In California, the insured and the insurer are in a special relationship. And the insurer is required to hold the insurer's interest on par, at least with its own. In this case, Liberty Mutual didn't do that. Moreover, the securities officer's case that was cited in our brief, which directly addresses the issue of whether or not the implied covenant of good faith modifies the right to settle an agreement, states that particularly when a party has discretion, that the implied covenant must limit the latitude of that party to act totally unilaterally. Liberty Mutual's position is that the $750,000 was, it was a number, it was just clear as day. They took this letter from Paula Hayton and said you multiply the amount of possible injury by 25% and equals $750,000. But as Your Honor stated, it's just a little too coincidental that that happens to be the maximum amount that could be paid by Snow Valley under the policy. And it wasn't settled for a dollar more. Moreover, in that very letter that they're referring to where Paula Hayton discussed the probability, she failed to cite to the exception that no, that workers' compensation is not available for a ski employee during his recreational activities. Moreover, her math was that there was a $3.5 million possible injury and 25%, but yet $150,000 was the appropriate amount to recommend to try to settle it. So it was only late in the game when Mr. Wexler, who only represented the interest of Liberty Mutual, was there ever an attempt to increase that amount to anything over $150,000, which Snow Valley had agreed to pay because it was going to be around or less than the cost of defense. It was only after Mr. Wexler, representing only Liberty Mutual, came into the ballgame that there was ever a suggestion to increase the amount to $750,000. Liberty Mutual suggests that there's this great coincidence and it didn't do anything wrong and it was considering the interest of the insured. I ask the court this, if that's true, why did it need Wexler to only represent itself? Why didn't Wexler represent both the interest of Snow Valley and Liberty Mutual? If there wasn't a conflict of interest, if it doesn't rise to the level of fraud, oppression, and malice, why did they take that action? It just simply doesn't make any sense. Now, the final issue I'd like to address is the absurdity of Liberty Mutual's suggestion that we somehow pressured Liberty Mutual into spending our own money. Effectively, what they're saying is Snow Valley pressured Liberty Mutual to spend its own money and it just doesn't make any sense. Liberty Mutual knew, and Snow Valley knew, that Liberty Mutual had a $25,000 retention under the general liability policy. That's in their attorney's notes. They believed it was higher. They thought it was the $150,000. But they understood that they thought that was all that Liberty Mutual was going to have to pay out. Or, I mean, that was all that Snow Valley was going to have to pay out. The argument that somehow Hancock pressured Liberty Mutual into paying money is absurd. Why would Liberty Mutual agree to allow that to occur? The reason? Because they thought that the special services instructions were enforceable, that they had complied with them throughout the entire existence of this relationship, and that they wouldn't agree to pay a dollar until they received consent from Snow Valley. If the Court doesn't have any further questions, thank you very much. All right, I think both sides have... Where are we on time? Out of time. Your Honor, I wanted to reserve some time for rebuttal. Yeah, but you have to keep track of your own time. Well, I don't sit up here like a referee or a timekeeper and call balls and strikes and time's out. Your six minutes over your 20 minutes. Six minutes over your 20 minutes. So, I'll tell you, I don't want you to leave here unhappy. I'll give you a minute. How about that? I'll go as fast as I can. Snow Valley keeps talking about Mr. Watkins' testimony about what it would mean to a workers' comp judge to have a dismissal as opposed to a compromise and release. That's testimony in response to generalized questions. His corrected testimony is that he explained to the judge, to avoid that impression, the impression that a dismissal would leave that no money was being paid. With respect to the internal documents that talk about zero, those are internal documents. That's how Watkins is reporting to his superiors what happened to the case. And because of the odd circumstances in which the settlement happened, he didn't know how to account for it. The money had gone through some other way. He hadn't paid any money, so he wrote down zero on purely internal documents. Those are not representations to the court. Why was Hayden replaced by Watkins? I don't know. They're both salaried employees, and at some point she may have left the company. So the short answer is you don't know. Yeah, I don't know. Right. When Mr. Wheeler represented to the superior court that everybody had signed the settlement agreement, the simple answer is Wetzler didn't know. Hancock was representing Snow Valley in that case, and for all Wetzler knew, Snow Valley had signed the settlement agreement. I'm just trying to clear up a few things. In California, every employer has to have insurance or satisfy the department that it has sufficient financial wherewithal to self-insure. Some employers who are not able to make that showing do some hybrid of that. That's what this was, essentially. Snow Valley made the choice to basically self-insure up to, you know, $750,000. It wants to make it seem like this retro is somehow unfair, but basically they self-insured for the first $750,000. And Liberty Mutual had the right to settle cases under that. Imagine a workers' comp system in which employers had the right to tell workers' comp insurers, no, no, no, don't spend my money on that injured employer or employee. That's not the way it works. And so there's nothing untoward about this. The fact that Liberty Mutual had the right to settle even after Snow Valley objected to the settlement. But your position is, listen, up to $750,000, we recognize that we're totally playing with Snow Valley's money, but you also had no obligation whatsoever to tell them what you were doing with their money. That's not really. No, that's what you just said. No. What I'm saying, Your Honor, is that the people who made the settlement decisions didn't know there was a retro feature, so they didn't know they were playing with Snow Valley's money. They thought they were playing with Liberty Mutual's money. But in any event, Liberty Mutual had the right and the obligation to settle cases. No, that's really hard to believe. This is the undisputed evidence. There's no evidence to the contrary in the record. I know, but we have a judge from Idaho that always reminds us of the smell test. Your Honor, I can recommend to you the Port East transfer case that's cited in Snow Valley's brief that explains why that's done. It explains it in great detail, why the people handling the claim shouldn't know about the financial aspects of the insurance policy. It's not unusual. There's nothing nefarious about it. It works to the insurance benefit precisely because you don't want the people giving away the money because it doesn't belong to their employers. And so it's for Snow Valley's protection that the claims handlers and the front-line attorneys don't know what the retrospective rating features are or if they exist at all, so that they don't decide, oh, what the heck, it's Friday, I want to go home early, I'll just give the insurance money away. That's why they don't know. And so these people didn't know. They were making honest, good-faith determinations with respect to settlement. And it's just pure coincidence that the 750 is close to, but not right at, the amount at which Liberty Mutual would have to pick up the risk. The reason Wexler was only representing Liberty Mutual in the civil case is that Hancock was counsel of record for Snow Valley in that case. We couldn't enter an appearance on their behalf, and we were there solely because of the tactics Hancock was employing in that case. One more thing. Snow Valley's counsel indicated that Liberty Mutual was aware of the features of Snow Valley's CGL policy. There is absolutely no evidence of that. The evidence he referred to is evidence of Mr. Watkins' guess that there was $100,000 self-insured retention under the workers' comp policy, not under the CGL policy. There is no evidence at all in this record that anybody at Liberty Mutual had any familiarity at all with any of the features of the CGL policy. It's just false. So we didn't know what the arrangements were there. For all we knew, Snow Valley benefited from pushing all the liability into workers' comp, and we defended the course and scope issue in the civil court. Okay. All right. The matter will stand submitted, and the court will recess until 9 a.m. tomorrow morning. Thank you, Your Honor. Goodbye. Sure.
judges: Kozinki, Trott, Bea